# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL HOOD, individually, and on
behalf of all others similarly-situated,

              Plaintiff,

    v.

UBER TECHNOLOGIES, INC., RASIER,
LLC, JOHN DOES I-V,

              Defendants.

Case No. 1:16-CV-998

**COMPLAINT – CLASS ACTION**

**Jury Trial Demanded**

Plaintiff Michael Hood ("Plaintiff" or "Mr. Hood"), by and through his undersigned counsel, alleges on behalf of himself and those similarly situated, as follows:

## INTRODUCTION

1.    This is an action by and on behalf of current and former Drivers ("Uber Drivers") for Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited Liability Company ("Defendants" or "Uber") who are or were employed by Uber in the State of North Carolina as "Independent Transportation Providers."

2.    Uber, a company valued at more than $50 billion, has and continues to take unfair advantage of financially struggling Uber Drivers by misclassifying them as "Independent Transportation Providers." Indeed, nothing could be further from the truth. Uber Drivers lack discretion in the performance of their employment relationship with Uber and have no independence in performing their work with Uber.

3.    Uber Drivers are able to secure fares only through Uber's mobile application, which governs every aspect of Uber Drivers' transportation services for Uber. When Uber restricts a Driver's access to Uber's mobile application, Uber effectively terminates the Driver,

as the Driver is unable to work for Uber or Uber's users. Uber's misclassification of its Drivers as non-employees of the company has resulted in Uber Drivers' inability to earn minimum wage.

4.     Plaintiff alleges that he and other Uber Drivers are employees, and, as employees, they are entitled to basic wage protections such as expense reimbursement (*i.e.*, gas, cost of insurance, lease payments, and repair, among others), overtime pay, rest- and meal-breaks, and other benefits that attach to employees and that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors in order to evade these and other protections of federal and state law.

5.     Uber has and continues to misrepresent to the public and to Uber Drivers how it compensates them so that it can retain a disproportionate percentage of the fares Uber Drivers generate. Uber markets its rides as gratuity-included, but Uber does not remit the gratuity (or an amount in-kind) to Uber Drivers. Uber effectively takes the tips. To worsen the reality for these Drivers, who are generally in dire financial condition, Plaintiff and members of the putative class finance all expenses related to their employment with Uber.

6.     As Uber's employees, Plaintiff and the class he seeks to represent are owed fundamental wage protections that federal law and North Carolina wage and hour laws afford other North Carolina employees. Plaintiff seeks damages and other appropriate relief on behalf of himself and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendants.

## PARTIES

7.     Plaintiff Michael Hood is a resident of Forsyth County, North Carolina. Plaintiff currently works for Uber as an Uber driver.

8.     Mr. Hood has consented to be a plaintiff to this lawsuit pursuant to 29 U.S.C. § 216(b). Plaintiff's executed Consent to Become a Party Plaintiff is attached hereto as Exhibit A.

9.     Defendant Uber Technologies, Inc. is a Delaware corporation headquartered at 1455 Market St, San Francisco, CA 94103. Defendant Uber owns and operates the Uber ride

sharing service and is authorized to conduct business and does conduct business throughout the State of North Carolina.

10. Defendant Rasier, LLC, a subsidiary of Uber and the equivalent of Uber for the purposes of this action, is a Delaware limited liability company headquartered at 1455 Market St, San Francisco, CA 94103. Defendant Rasier is authorized to conduct business and does conduct business throughout the State of North Carolina.

11. Each of the Defendant John Does 1 - 10 is the agent, servant, partner, joint-venturer, coventurer, principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its codefendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiff names each of these Doe Defendants by fictitious names because Plaintiff does not know these Defendants' actual identities and capacities. Despite reasonable efforts, Plaintiff has not been able to ascertain the identity of John Does 1-10.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and the parties are diverse. Plaintiff is a citizen of the State of North Carolina and Defendants are citizens of the State of Delaware.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the aggregate claims of the Class (as defined below) exceed the sum or value of $5,000,000.00, there is minimal diversity of citizenship between Plaintiff and Defendants, and the class consists of more than 100 members.

3

15. This Court has personal jurisdiction over Defendants because Defendants intentionally avail themselves of the rights and privileges of conducting business in North Carolina and Defendants have continuous and systematic contacts with the State of North Carolina. The harms alleged also result from Defendants' conduct in the State of North Carolina.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims over which the Court has original subject matter jurisdiction that the state law claims form part of the same case or controversy.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as many of the events and conduct giving rise to the claims occurred in this District, and because Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of their product in this District; do considerable business in this District; and are subject to personal jurisdiction of this District.

18. Plaintiff alleges on information and belief that each Defendant acted in all manner relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## FACTUAL ALLEGATIONS

### A. Plaintiff Michael Hood

19. In September of 2015, Mr. Hood began working for Uber as an "UberX" driver. Mr. Hood continues to work for Uber as a driver.

20. On average, Mr. Hood drove fifty hours per week throughout his employment with Uber. Often, Mr. Hood drives over sixty hours per week.

21. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an

4

independent contractor, he had to pay from his portion of the fare all employment related expenses, including gas, car repairs, lease payments, and insurance.

22.     On average, Mr. Hood earned approximately $500 each week and incurred approximately $200 each week in expenses, including, but not limited to, gas, insurance, and car repairs, resulting in an average effective hourly wage of $6.00, which reflects Mr. Hood's total compensation as an Uber driver. The minimum wage in North Carolina in 2015 and 2016 was $7.25.

23.     For example, during the week of December 14, 2015, Mr. Hood worked 56.84 hours and was compensated $311.07. After paying $200 in employment related expenses that week, Mr. Hood earned just $111.07, resulting in an effective hourly wage of $1.95, well below North Carolina's minimum wage.

24.     For example, during the week of December 28, 2015, Mr. Hood worked 79.62 hours and was compensated $721.67. After paying $200 in employment related expenses that week, Mr. Hood earned $521.67, resulting in an effective hourly wage of $6.55, well below North Carolina's minimum wage.

25.     For example, during the week of April 25, 2016, Mr. Hood worked 65.44 hours and was compensated $513.14. After paying $200 in employment related expenses that week, Mr. Hood earned $313.14, resulting in an effective hourly wage of $4.78, well below North Carolina's minimum wage.

26.     Mr. Hood's hourly wage was not at any time offset by expense reimbursement from Uber. Although it is currently unknown to Plaintiff as it pertains to North Carolina, Uber has saved as much as $730 million since 2009 by not reimbursing on-the-job expenses in California and Massachusetts.[1]

---

[1] http://qz.com/680503/uber-saved-730-million-by-hiring-drivers-in-two-states-as-contractors-instead-of-employees/ (last accessed on May 11, 2016)

27.     On December 11, 2015, Defendants issued their most recent Technology Services Agreement, which contained an arbitration provision and a class action waiver. Among other things, the agreement requires Drivers to opt out of the mandatory arbitration provision within 30 days.

28.     On December 28, 2015, Mr. Hood timely opted out of the arbitration agreement by sending an e-mail to optout@uber.com and complying with the directions in the agreement. His e-mail included the following message: "I, Michael Hood hereby notify Uber & Rasier LLC of my intent to Opt-out of the Binding Arbitration Provision of Rasier Technologies Services Agreement."

29.     The December 11, 2015 Technology Services Agreement supersedes prior contacts because Paragraph 14.5 sets forth the following:

> This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces *and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter*. (emphasis added).

30.     Because the December 11, 2015, Technology Services Agreement included changes in the arbitration provision, Mr. Hood received a renewed opportunity to opt out of arbitration and pursue his claims in federal court.

31.     He properly exercised his right to opt out.

**B.  Uber Controls the Manner, Methods, and Means of Uber Drivers' Work**

32.     Defendants employed Plaintiff and members of the Class and exercised complete control over their wages, their hours, and their working conditions.

33.     Uber controls the manner, methods, and means of Uber Drivers' provision of transportation services for Uber. Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

34.     Indeed, Defendants regulate *every* aspect of Uber Drivers' job performance.

6

35.     As with other employers, Defendants required Plaintiff and Uber Drivers to submit to background checks and to disclose banking information and residence, as well as social security numbers, prior to being hired.

36.     Uber required Plaintiff and Uber Drivers to register their cars with Uber and the vehicles cannot be more than ten years old.

37.     Uber Drivers are not engaged in a business distinct from Uber's business.  The Uber application ensures this.  Through the application, Uber controls and directly manages Uber's entire transportation service.

38.     Plaintiff's and Uber Drivers' ability to earn income depends solely on Uber and not in any way on an Uber Driver's particular skill or acumen or on any managerial or other discretionary job skill.

39.     Uber Drivers must strictly follow a litany of very specific company imposed regulations that govern how, when, where, and who gets to work, yet Uber enjoys the benefits of misclassifying Uber Drivers as "independent contractors."

40.     Uber's rules and regulations for Uber Drivers govern almost every facet of the job, and Drivers have little opportunity to deviate from Uber's proscribed means and methods of doing business.

41.     Uber Drivers must adhere closely to Uber's parameters in order to be eligible to drive in the first place. Uber pushes potential Uber Drivers to purchase or lease specific types of vehicles.

42.     To avoid termination, all Uber Drivers must maintain these vehicles and achieve a certain star rating in a system devised and monitored closely by Uber.

43.     From fares and fees, to what to wear and what route to take, in addition to subjecting its employees to constant monitoring by GPS, Uber directs and sets the terms and conditions of Uber Drivers' work. Although Uber's rules are often described as "suggestions," Uber Drivers understand clearly that failure to follow these guidelines results in temporary or permanent termination of their employment with Uber.

44.     Uber is deeply involved in marketing its transportation services, setting prices for services, selecting and qualifying Uber Drivers, regulating and monitoring their performance, and disciplining or terminating those who don't measure up to Uber's expectations.

45.     Plaintiff claims that Uber exercises near total control over the means and method of his work. For example, Uber controls the terms and conditions of employment from what to wear to what route to take, to setting customer fares and Uber's fee. Uber has the authority to hire, fire, and discipline Uber Drivers.

46.     Uber's control begins through a series of communications given by Uber to Uber Drivers when they sign up to drive with Uber or to affiliate their vehicles with the company, including instructional tips, videos, a handbook, and in-person trainings that have the force of a code of conduct/employee rules.

47.     Where the prescribed conduct is not followed, Uber Drivers are subject to poor ratings, decreased access to dispatches, decreased access to the most profitable class of dispatches, and termination, or "deactivation" in Uber's parlance.

48.     Uber mandates each Driver view various "on-boarding instructional" videos in order to affiliate a vehicle and or receive dispatches from Uber.

49.     These videos instruct Uber Drivers on how to interact with customers in order to provide them with the desired Uber experience.

50. Uber directs Uber Drivers' grooming, dress, and personal hygiene.

51. Uber seeks to control the type of conversations Uber Drivers have with the customers, recommending they comment on how much they like working for Uber and instructing them to encourage the customer to recommend Uber to friends.

52. Uber Drivers received handbooks that give detailed instructions on how to operate the Uber app, how long to wait for passengers, and exactly how to respond to passengers who attempt to offer cash tips.

53. The handbook gives detailed directions on exactly when an Uber Driver can start charging for wait time. Drivers are instructed that, if the customer answers a phone call and requests the Driver to wait longer than ten minutes, the Driver should ask if the customer agrees to pay for wait time, and start the in-app meter at the ten-minute point.

54. The handbook details a list of behaviors that lead to one-star ratings and five star ratings, respectively. Actions that lead to 1-star ratings include calling a rider unnecessarily, asking for five star ratings, asking for tips, taking an inefficient route, or accepting cash. Actions that lead to 5-star ratings include asking if the passenger has a preferred radio station, communicating throughout the trip, always asking for the passenger's preferred route, and politely greeting the passenger and asking their name.

55. Although, in conveying the above rules, Uber has, more recently, labeled its direction to Uber Drivers as "tips" and "suggestions," this choice of words makes no practical difference to Uber Drivers; when these expectations are not met, Uber may discipline and even terminate Uber Drivers' employment completely.

56. Uber Drivers also received consistent instruction throughout the term of their employment by way of mass e-mails sent by Uber to all Uber Drivers, reminding them, for

example, that not accepting trips would lead to being locked out of the app, or that drivers could be deactivated for recommending that riders take trips with other transportation services.

57.     Uber maintains a substantial interest not only in the behavior of Uber Drivers, but also in the presentation and mechanical upkeep of their cars, including the type of vehicle and level of service.

58.     Uber's control extends to its dispatch of fares, which it does in order of preference based on Uber Drivers' acceptance rate and star rating, in addition to a Driver's proximity to the customer.

59.     Uber's control extends even to the routes taken by Uber Drivers. While the Driver contract requires Drivers to accept responsibility for the effectiveness and efficiency of Uber rides, Uber unilaterally decides what route a Driver should take or, after the fact, should have taken, and will reduce a Driver's pay accordingly, without first consulting the Driver, or even examining the surrounding traffic conditions.

60.     In pursuit of maintaining consistent five-star service, Uber reserves the right to deactivate Uber Drivers based on passenger ratings and indeed encourages passengers to offer feedback on Uber Drivers to create a more uniform experience.

61.     In addition to deactivating for failing to accept 90% of dispatches or failing to maintain a 4.5-star rating, Uber's practice is to deactivate Uber Drivers in the bottom 5% of its ratings, regardless of whether Uber Drivers' activity has prompted any specific complaints.

62.     Plaintiff alleges that on a busy workday, Uber Drivers receive approximately eleven ride requests through the Uber mobile application.  Once the request is received, Plaintiff has an option to either "accept" or "reject" the request.  Accepting less than the 90% threshold

results in Uber deactivating Uber Drivers' accounts, and therefore, preventing the drivers from receiving any rider requests.





## HOW ARE ACCEPTANCE RATES CALCULATED?

Acceptance rates are calculated as a percentage of the total number of requests you accept out of those sent to you while online.

Maintaining a high acceptance rate keeps the Uber system reliable for riders and drivers. You should accept at least 80% of trip requests to retain your account status.

Please note that a rider canceling a trip will never count against your acceptance rate.

63.     Rejecting a certain number of requests will negatively impact Uber Drivers' customer rating.  The employment agreement terms between Uber Drivers and Defendants, updated last on December 11, 2015, contains a provision that specifically states that the Uber Drivers' "failure to accept User requests for Transportation Services while [they] are logged in to the Driver App creates a negative experience for Users of Uber's mobile application."  Again, if the rating falls below a 4.5, the driver faces termination from employment with Defendants, or a temporary deactivation of access to the Uber mobile application, *i.e.*, probation.

64.     Uber monitors Uber Drivers to ensure compliance with Uber's quality control standards.  Uber requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars.  Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week.  If an Uber Driver fails to maintain an average customer rating of 4.5, Uber gives the Driver 30 days to raise her rating within the required threshold. If the Uber Driver does not do so, Uber terminates that Driver's employment with Uber by deactivating the Driver's ability to use the application to pick up customers, and thus to continue to work. Uber Drivers are also effectively fired from Uber's

employment if they do not log a certain number of hours driving, as required by Defendants. Plaintiff currently maintains a 4.7 star rating.



65.     All aspects of the business affecting the bottom line are set by Uber, in its sole discretion.

66.     When the passenger completes the trip, Uber's control extends to all aspects of the financial transaction.

67.     Uber also unilaterally sets the fares—with no negotiation or input from Plaintiff—for all rides, and Uber Drivers are required to charge the cost determined solely by Uber.  Uber bills customers for the entire amount before remitting payment to Uber Drivers.  Uber Drivers are paid by Uber.

13

68.    Uber Drivers are denied all independent judgment or control about what fare to set to meet their bottom line.

69.    Uber collects all monies from passengers and disburses such monies according to its own accounting procedures and policies.

70.    Just as Uber's control of the bottom line is inconsistent with Uber Drivers' operation of an independent business, so too is Uber's requirement that customer goodwill flow to it, not to Drivers.

71.    In order to drive for Uber, Uber Drivers must purchase or lease a vehicle that meets Uber's specifications.

72.    Uber Drivers have no opportunity to receive profits directly from Uber's business. Rather, the amount of their earnings, like other employees, depends solely on the amount of time that they work, and the number of rides that Uber dispatches to them during that time.

73.    Uber Drivers require no special skill or independent initiative to perform their work. Indeed, Uber's recruitment platform to potential Drivers is that *anyone* with a car can become an Uber Driver.

74.    Uber does not require a specially skilled workforce, as it can better impose its branded service through extensive rules and ceaseless monitoring and supervision.

75.    Uber Drivers are subject to supervision by Uber, whether the work is done with or without a passenger.

76.    Uber's app maintains constant GPS contact with Uber Drivers. Indeed, this constant tracking is required in order for Uber to match potential customers with its Drivers based on proximity.

77.    Uber Drivers' contracts are indefinite and not renewed on a job-to-job basis.

14

78.     Uber Drivers' managerial skills do not affect their opportunity for profit or loss.

79.     In addition to the above indicia of an employment relationship between Uber and Uber Drivers, including Plaintiff, Uber's pay structure also demonstrates the existence of an employment relationship. Although Uber's basic structure for Driver payments is based on per-trip payments, Uber pays the Driver for the time and mileage covered rather than merely charging passengers a flat rate.  Practically, Uber pays Uber Drivers by the hour, not by the job.

80.     Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards), and fare setting.

81.     Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

82.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers.  For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

**C. Uber Profits by Deceiving Consumers and Drivers**

83.     Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application – an expense that Uber, the employer, should pay.

84.     Uber mislead Plaintiff as to the amount of income he could earn driving for Uber. Uber told Plaintiff that drivers can earn $2,000 a week by driving for Uber.  Plaintiff did not earn the guaranteed hourly pay that Uber promised, regardless of the fact that the Plaintiff worked more than a 40-hour week.



85.    Even if a Driver could earn $2,000 a week, the advertisement and offer is deceptive and misleading because in reality, as evident from Plaintiff's experience, after expenses and other costs improperly borne by Plaintiff, Uber Drivers often make less than minimum wage, $7.90 an hour in 2014, and $8.05 an hour in 2015.

86.    Moreover, Plaintiff and Uber Drivers do not receive (in-kind or otherwise) fare gratuity.

87.    Uber misleadingly states that gratuity is included in the total cost of the fare and that there is no need to tip Uber Drivers:

DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

88.     On its website, Uber specifically advertises: "no cash, no tip, no hassle – when you arrive at your destination, just hop out – we'll automatically charge the credit card on file. And there's no need to tip."[2]

89.     On its website directed to North Carolina Uber Drivers, Uber specifically advertises, "No need to tip."[3]

90.     Uber also instructs its Drivers to decline acceptance of gratuity.

91.     Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.

92.     Due to Uber's "there's no need to tip" mandate, Plaintiff and Uber Drivers have sustained damages in the amount of gratuity that they would have received (even if in-kind) but for Uber's misrepresentation.

**D.  Uber's Profit Model is Based on Misclassifying Drivers as Independent Contractors**

93.     In addition to its deceptive and unlawful practice regarding tipping, despite the control that it exercises over Uber Drivers, Uber uniformly misclassifies Uber Drivers, including Plaintiff, as independent contractors when they should be classified as employees.

94.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, overtime, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).   Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Uber also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

---

2  https://www.uber.com/ride/ (last accessed on May 16, 2016).
3  https://www.uber.com/cities/charlotte/;
   https://www.uber.com/cities/greensboro/;https://www.uber.com/cities/asheville-nc/;
   https://www.uber.com/cities/fayetteville/ (last accessed on May 16,   2016).

**<u>CLASS ACTION ALLEGATIONS</u>**

95.     Plaintiff commences this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, including Rule 23(b)(3), on behalf of the following class:

> All natural persons who have driven for and/or who continue to work for Uber as an Uber Driver within the State of North Carolina from 2010 and continuing.

96.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

97.     **Numerosity**:  The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. The precise number of such persons is unknown as the data required to calculate that number is presently within the sole possession, custody, or control of Defendants.  Upon information and belief, there are thousands of Uber Drivers in the State of North Carolina, and thus in the proposed Class.

98.     **Commonality**:  There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including but not limited to:

a.  The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

b.  Whether Defendants are and were subject to overtime wage requirements;

c.  Whether Defendants' policy and practice of classifying Class members as exempt from overtime wages under federal law and Defendants' policy and practice of failing to pay overtime wages violates applicable provisions of federal law;

d.  Whether Defendants violated North Carolina law by their policies, practices, and procedures concerning or relating to rest periods for the Class members;

e.  Whether a gratuity is included in the total fare for Class members' services;

f.  Whether Defendants were and are required to distribute the total proceeds of those gratuities to the Class members;

g.  Whether Class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

h.  Whether Defendants improperly classified Class members as independent contractors rather than employees;

i.  Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

j.  Whether Defendants have violated North Carolina minimum wage law;

k.  The proper measure of damages and the proper measure of restitution recoverable by Class members; and

l.  Additional common questions of law and fact as developed during the discovery phase of this litigation.;

99.     **Typicality**:   Plaintiff's claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiff seeks is typical of the relief that Class members seek.  All of the Class members were subject to the same pattern and practice of Defendants as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of the Defendants.

100.     **Adequacy of Representation:**   Plaintiff is able to fairly and adequately protect the interests of the Class and have no interests adverse to the Class.   At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

101.     **Superiority**:  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

102.     The Class members are also readily ascertainable.  For purposes of notice and other purposes related to this action, their names and addresses are known to Defendants.  The number and identity of the Class members are determinable from the records of Defendants.

103.     The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be

able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF NORTH CAROLINA LAW

104.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

105.    Uber's treatment of Plaintiff and control exercised by Uber indicate that Plaintiff is an employee and not an independent person contracting with Uber.

106.    Plaintiff seeks damages pursuant to North Carolina's Wage & Hour Act General Statutes for Uber's violations of the same, including

a.    Failure to remit minimum wage to Driver employees in violation of N.C. Gen. Stat. § 95-25.3; and

b.    Failure to remit overtime compensation to Driver employees in violation of N.C. Gen. Stat. § 95-25.4.

107.    As a result of Uber's violations, Plaintiff is entitled to recover damages associated with the wages and benefits withheld in violation of North Carolina law as well as attorneys' fees pursuant to N.C. Gen. Stat. § 95-25.22(a) and (d).

### COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACT & BUSINESS RELATIONS

108.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

21

109.    Uber interfered with the continuing business relationship between Uber Drivers and passengers—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to Drivers, including Plaintiff, absent Uber's interference.

110.    Uber intentionally and maliciously interfered with Plaintiff and Uber Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

111.    Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

112.    For example, up until the end of 2012, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Beginning in 2013, Uber's website has stated that "there is no need to tip."

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

113.    Even after the statements were apparently removed from the Uber's website at the end of 2012 that tips are included in the fare, Uber has nevertheless continued to inform passengers through marketing materials that tips are included in the fare. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

114.    In addition, at various times (and at least through the end of 2012), Uber's contracts with its customers have incorporated by reference the statements and representations made on its website regarding pricing, which includes such statements as the "tip is included" in the fare. For example, Uber's contracts with its customers (at least through the end of 2012) contained such statements as: "The Company may change the fees for our Service or Software as

22

we deem necessary for our business. We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software."

115.    Despite Uber's representations to customers that the fare includes a gratuity (and despite Uber's contracts with customers that incorporated its pricing information on its website, including the website statements that "tip is included"), Uber Drivers have not received the proceeds of this gratuity.

116.    In reality, Uber collected gratuities and then failed to remit them to Drivers.

117.    Based on its past practices of not remitting gratuities to Drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its Uber Drivers.

118.    Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for Uber Drivers as is customary in the car-service industry.

119.    Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

120.    Uber's conduct damaged Plaintiff and other Uber Drivers.

**COUNT III**
**BREACH OF CONTRACT**

121.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

122.    Uber has an implied in-fact contract with Plaintiff and other Uber Drivers to remit the total proceeds of all gratuities.

123.    Plaintiff and other Uber Drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to Drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various

23

webpages. By entering into this agreement, customers intended to secure a financial benefit for Drivers, including Plaintiff, in the form of gratuity and to act directly for the Drivers' benefit.

124. At all times, Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare. Uber has also failed to reimburse Plaintiff for his employment related expenses.

125. Uber's conduct damaged Plaintiff and other drivers.

## COUNT IV
## UNJUST ENRICHMENT

126. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

127. Defendants unlawfully retained gratuities promised to Plaintiff and other Uber Drivers and failed to reimburse expenses.

128. Defendants obtained these benefits from drivers by making material misrepresentations and taking advantage of them.

129. As a result, Defendants have been unjustly enriched through their retention of a portion of the gratuities owed to the drivers.

130. Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities.

## COUNT V
## CONVERSION

131. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

132. Plaintiff and other Uber Drivers have a superior right to possession of gratuities.

133. Uber interfered with Plaintiff's right to his personal property by refusing to relinquish the property to them. Instead, Uber retained the property for its own benefit without Plaintiff's permission.

24

134. The converted property was personal. For examples, the gratuities were specifically earmarked for the Drivers.

135. Uber's conduct damaged Plaintiff and other drivers, and they are entitled to restitution for their full share of proceeds, as well as treble damages.

## COUNT VI
## FRAUD AND/OR INTENTIONAL OR NEGLIGENT MISREPRESENTATION

136. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

137. Uber represented to Plaintiff and other Drivers that they would receive gratuities, surge fares, and cancellation fees. Uber did not pay these monies as promised.

138. These misrepresentations were material because they affected Plaintiff and other Drivers' decisions to continue driving for Uber.

139. Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other Drivers based on its past practices of not doing so.

140. Plaintiff and other Drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was his employer and the party responsible for overseeing the payment of these monies.

141. Uber's conduct damaged Plaintiff and other Drivers.

## COUNT VII
## PROMISSORY ESTOPPEL

142. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

143. Uber promised to make certain payments, such as hourly wages, cancellation fees, and other payments, and to remit all gratuities to Plaintiff and other drivers. Instead, Uber kept this money for itself.

144. Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

145. Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

146. Plaintiff's and other Drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

147. Uber's conduct damaged Plaintiff and other drivers.

148. Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

## COUNT VIII
## VIOLATIONS OF FAIR LABOR STANDARDS ACT

149. Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

150. Plaintiff alleges that Defendants have required Plaintiff and Uber Drivers who have driven for Uber, as part of their employment, to work without receiving the minimum wage for all hours worked, under 29 U.S.C. § 206(a), which provides in pertinent part, "[e]very employer shall pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

151. Plaintiff alleges that Defendants have required Plaintiff and Uber Drivers, as part of their employment, to work without additional compensation, such as overtime pay, in excess of the forty hours per week maximum under 29 U.S.C. § 207(a)(1), which provides the following: "Except as otherwise provided in this section, no employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate which is not less than one and one-half times the regular rate at which he is employed."

152. Plaintiff further alleges, in accordance with 29 U.S.C. § 216, that Defendants have required Plaintiff and Uber Drivers, as part of their employment, to work without compensation for *all* hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or to work at a wage less than the minimum wage, pursuant to, *inter alia*, 29 U.S.C. §§ 206 and 207(a)(1).

153. Plaintiff's FLSA claims are brought not only for alleged overtime violations, but also for alleged off-the-clock and minimum wage violations as well. Indeed, in the performance of their duties for Defendants, Plaintiff typically worked more than forty hours per week, yet did not receive straight or overtime compensation for the work, labor, and services he provided to Defendants, as required by the FLSA. The precise number of unpaid overtime hours will be proven at trial.

154. Defendants' violations of the FLSA were willful and are ongoing. As a result of the foregoing, Plaintiff seeks judgment against Defendants for all unpaid wages, including overtime wages owed pursuant to 29 U.S.C. §§ 206 and 207, together with an award of an additional equal amount as liquidated damages, and costs, interests, and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against the Defendants as follows:

      a.      An award of damages, including compensatory, punitive, and treble damages, in an amount to be determined at trial;

      b.      Notice to the Class of the action;

      c.      An injunction against Defendants prohibiting Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.      Liquidated damages, pursuant to the North Carolina's Wage & Hour Act and FLSA;

e.      Declaratory relief that Plaintiff and members of the class are employees under the relevant law;

f.      Reasonable attorneys' fees and costs of this action;

g.      Pre-judgment and post-judgment interest as provided by law;

h.      An Order requiring that Defendants return to Plaintiff and the Class any gratuities and any other funds wrongfully kept by Defendants; and

i.      Such other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff, on behalf of himself and the proposed class, demands a trial by jury on all claims so triable.

July 26, 2016

*/s/* Paul R. Dickinson, Jr.

Paul R. Dickinson, Jr.
N.C. State Bar No. 20510
LEWIS & ROBERTS, PLLC
One Southpark Center
6060 Piedmont Row Drive South,
Suite 140
Charlotte, NC 28287
Tel:     (704) 347-8990
Fax:     (704) 347-8929
E-mail: prd@lewis-roberts.com

Paul B. Maslo (pro hac vice pending)
N.Y. State Bar No. 4731501
NAPOLI LAW PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10019
Tel:    (212) 397-1000
Fax:    (646) 843-7603
E-mail: pmaslo@napolilaw.com

Brittany Weiner (pro hac vice pending)
N.Y. STATE BAR NO. 4994885
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, NY 10123
Tel:     (212) 736-0007
Fax:     (212) 658-9177
E-mail: brittany@lawicm.com

*Attorneys for Plaintiff*